ALBERT H. CHATFIELD v. THE CITY OF CINCINNATI.

1. A purchaser of platted lands is bound by recitals of the plat in existence though subsequently recorded.
2. The holder of a perpetual leasehold, if duly authorized by his deed of conveyance, may make a lawful dedication binding on the holder of the fee.
3. A common law dedication if properly made is equally effective with a statutory dedication.
4. A common law dedication of lands insures to a municipality subsequently organized thereover. The public is an ever-existing grantee capable of taking dedication for public use.
5. Actual acceptance and opening of a dedicated street not necessary to perfect the dedication, nor are *laches* imputable, until circumstances arise in the growth of a municipality calling for such action.
6. An indorsement of reservation by a purchaser of platted lands who subsequently replats, is not effective as to prior dedicated streets, where the prior dedication had become effective by sales of lots, etc.

HOSEA, J.

Plaintiff avers ownership and possession of fifty-two feet, more or less, on Saunders street, Cincinnati, extending northward to Estelle street, and improved by a dwelling-house. He claims that the city has entered upon his said lot and constructed and maintains a public stairway and plank walk thereon between Estelle and Saunders streets to his irreparable injury, and prays a perpetual injunction.

The city by answer claims 23 feet of the east 25 feet of said premises through dedication by plaintiff's predecessors in title; and issue is taken by a general reply.

Waiving the obvious criticism upon the form of the action, and the allegations of the petition, the questions will be considered as though properly pleaded and as upon issues properly raised, in view of their public importance.

Without going into unnecessary prolixity of detail, it appears that plaintiff derives title to the premises—described in his petition as a lot "52 feet more or less on Saunders street"—through two deeds, namely:

(1) *January 24, 1900,* from O'Hara, assignee of F. G. Huntington, to land described by metes and bounds "commencing at the northwest corner of Saunders and Sycamore streets," etc., "being the east part of lot No. 82 and the south part of lot No. 81 of Wm. C. Huntington's subdivision"—elsewhere referred to by its record in Hamilton county records.

(2) *December 30, 1901,* a release and quit-claim to a strip described by metes and bounds beginning on Saunders street, at the southeast corner of lot No. 82 of the W. C. Huntington subdivision, extending twenty-five feet east on Saunders street to southwest corner lot ten of the subdivision of Frederick G. and Frank Huntington, and extending back to Estelle street one hundred and forty feet, and containing the following further reference:

"Being the same property which is sometimes referred to on the records of said county as part of Lewis (also called Sycamore) street, and which was expressly excepted by said William C. Huntington from dedication, and reserved to himself in his said plat," etc.

By stipulation of counsel, it is admitted that the said strip of 23 (of the 25) feet has not been on the tax duplicate or taxed since 1884; and that the dwelling on lot 82 encroaches two inches in front and six and seven-eighths inches in rear upon the twenty-three feet constituting Lewis (or Sycamore) street; and it appears in testimony that

said dwelling was built in about 1883 by Fred. G. Huntington, and that its east wall was built with a dozen windows opening upon the strip called Lewis (or Sycamore) street.

It thus appears, contrary to the inferences of the petition, that the improvements upon the property were not placed upon the lands described therein as a whole, nor with reference to their condition as an entire tract, but distinctly upon a specified portion only and bounding upon a platted street, which street is the subject of controversy here; and these facts are made plain in the deeds whereby plaintiff acquired title.

The testimony of the records upon the question at issue is as follows:

(a) As early as 1828 a plat was recorded in Deed Book 29, page 17, of a subdivision of part of the estate of Thomas Hughes, lying north of the corporation line of Cincinnati, made by trustees and legatees under the will of said Hughes, deceased, and approved by the city surveyor. This plat (Exhibit 1) shows lots bounded on Main street on the west and Sycamore street on the east, as extended northwardly; and refers to said streets in its descriptions.

(b) In 1836 (Deed Book 62, page 39) is recorded a perpetual leasehold, by the trustees of Thomas B. Hughes, deceased, to Eden B. Reeder, of property including that last above noted, and more particularly described by boundaries, the eastern boundary described being: "land now owned by Lloyd Wayne, and a road or street being an extension of Sycamore street," etc. By the terms of this indenture it was provided that said Reeder, his heirs and assigns were to have the privilege of "subdividing said property into lots, opening streets and alleys, and dedicating the same for public use," etc. (Exhibit 9.)

(c) Later in 1836 (Deed Book 62, page 41) appears an assignment of the "lease and the premises contained" by Reeder to McCleany and Bissell, with certain reservations bounding on Sycamore street extended," and others "on said Reeder's continuation of Sycamore street"; and all

"subject likewise to the streets and alleys dedicated to public uses by said Reeder in his subdivision of the premises," etc.

(*d*) The plat of Reeder's subdivision, referred to in the preceding item (*c*) was put on record Feb. 3, 1838 (Deed Book 65, pages 374-5). This plat covers various tracts derived from the Hughes estate and extends Sycamore street northward, with the following remarks:

"In extending Sycamore street northward to the end of the premises a strip of two feet in width is reserved between that extension and the east line of the premises, until the owner or owners of the property adjoining shall lay out an addition of twenty-five feet in width so as to make a fifty-foot street for such parts on the whole length as shall be so added and laid out," etc.

Also: "The streets, alleys and avenues are set apart and dedicated as a right of way for public use forever," reserving a right of alteration for ten years where no sales shall have been made. This plat was signed and duly acknowledged by Eden B. Reeder before John Burgoyne, associate Judge in and for Hamilton County, Ohio, on February 4, 1838.

(*e*) Next appears in 1841 (Deed Book 82, pages 419-20), a plat and accompanying description of Greenbury Dorsey's division made by Salmon P. Chase, his trustee, and confirmed and ratified by G. Dorsey by C. Byrne, attorney in fact (his power also being recorded, Mortgage Book 83, page 73).

This plat covers the same property shown in Reeder's subdivision (item *d*) and differs in detail chiefly with regard to certain new cross-streets laid out from Sycamore street west, but makes no change whatever as to Sycamore or Lewis street. Eden B. Reeder also endorses on said plat his acceptance and confirmation of the same by virtue of his reserved right of alteration before referred to. The plat is also endorsed as accepted by certain intervening purchasers.

(*f*)   Next is presented a conveyance in fee simple, dated May, 1867 (Deed Book 344, page 96), from the surviving heirs of John D. Saunders, deceased, to W. C. Huntington, of lots D, E, F, G, H and I, of lots on the Dorsey plat as made by S. P. Chase, trustee" (item *e, ante*), "subject to the conditions of a lease by Chase to the ancestors of these grantors and of the lease made by the trustees of Thomas Hughes to Eden B. Reeder" (item *b, ante*).

(*g*)   Next in order is a deed of release and quit-claim dated January 23, 1875, from the trustees of Thomas Hughes, to certain lands, among others that described as bounded on the west by Locust street, north by Mason street, east by lands of Holden, Thoms, Smith and Huntington, south by Saunders street: "said lot being shown as D, E, F, H and I, Dorsey Blue Plat, Hamilton County, Auditor's office."

(This, as will be seen, is the same property covered by item *f, ante,* the omission of lot "*G*," being doubtless a clerical error in the copy in evidence.)

(*h*)   W. C. Huntington in the same year (1875) made a re-subdivision of the grounds thus purchased (Plat Book 4, pages 226-7), stating it to be "part of the lands subdivided by Chase, trustee of Dorsey, and known as the Dorsey Blue Plat." On the Huntington plat Sycamore or Lewis street is shown as an open street extending from Saunders street north to Mason; but in the general endorsement is a reservation, already quoted, of the portion between Saunders and Estelle—which is the portion in controversy here.

(*i*)   In this connection, although out of order in date, should be considered a plat by W. C. Huntington, and approved and adopted by the Platting Commission July 30, 1895, showing the vacation by statutory proceedings of Sycamore street south of Saunders street, but incidentally showing Sycamore street north of Saunders as an open street.

(*j*)   Lastly, and under this head, may be grouped certain deeds to various parties beginning with one in 1875 to lot 81 as "being part of the lands on the Dorsey Blue

Plat," and of other lots shown on the Huntington plat and also mesne conveyances, of these lots—particularly of 81 and 82, described as bounded upon Lewis street (Sycamore).

Coming now to consider the probative value and effect of this record evidence, it must be conceded that the Hughes plat (A) of 1828 is of no significance except as showing an intention to continue Sycamore street north from the corporation line as a public street; and as explanatory of the subsequent plat of Reeder showing a further "extension" of the same northward.

The crux of the case is the next subsequent plat (D) by Eden B. Reeder. The record (B) shows that in 1836 the trustees of Hughes, deceased, executed a perpetual leasehold of the preceding and other property of Hughes' estate, including the general territory involved in the present controversy. The description of the property as contained in the indenture, is by a very general reference to boundaries and to a plat of record corresponding with the record of the Hughes plat (A). For present purposes we must assume —there being no evidence to the contrary—that the subdivision by Reeder, subsequently shown, covered the property actually conveyed. The significant feature of the conveyance in question is the specific authority given to Reeder to subdivide and dedicate in the following words:

*"It is further agreed between the parties that said Eden B. Reeder, his heirs and assigns, shall have the privilege of subdividing said property aforesaid into lots, opening streets and alleys, and dedicating the same for public uses."*

It appears from the recitals of the assignment (C) of parts of this leased property, that Reeder, very soon after acquiring the same, did make a subdivision, the plat of which was not recorded for two years later (1838). In view of the recitals of the assignment, however, the delay in recording was not material, since the assignment was made with reference to the plat and *"subject to the streets and alleys dedicated by said Reeder in his subdivision of the premises."*

This point was long ago decided by this court in the case of *Gest* v. *Kenner*, 2 Handy, 87, wherein Judge Storer states the principle as follows:

"Though the plat stated in the deed might not have been recorded, the recital was evidence that a plat had been made and was then in existence, and the parties were bound by all the legal consequences of the dedication which the plat, when recorded, would establish."

The Reeder plat recorded in 1838, while it includes the property shown in the Hughes plat, also includes property northward thereof, and other tracts not involved here. This plat shows Sycamore street extended northwardly through the entire tract with an indicated width of twenty-three feet and with the boundary line of the tract shown as two feet eastward of same. The explanation accompanying the plat includes the following:

"In extending Sycamore street to the north end of the premises, a strip two feet in width is reserved between that extension and the east line of the premises, until the owner or owners of the property adjoining shall lay out an addition of twenty-five feet in width so as to make a fifty-foot street for such parts on the whole length as shall be so added and laid out";

And also the following:

"The streets, alleys and avenues are set apart and dedicated as right of way forever, * * * saving the right within ten years to change, alter or vacate any street," etc.

The claim of plaintiff that the Reeder lease was only to Sycamore street as a boundary, and therefore did not include the property in controversy, is not tenable. *Crane* v. *Buckles*, 1 N. P., 51 (aff. in 52 O. St., 613); *Gest* v. *Kenner, supra* (page 91).

The claim that Reeder having only a leasehold estate could not dedicate, seems to be also based on a misapprehension of the record facts. The right to dedicate was expressly given in Reeder's lease, as shown, and he was thus

constituted a duly authorized agent for that purpose independently of the title acquired by him. His authority is also proved by the acquiescence of the trustees; and by their subsequent deeds to W. C. Huntington with recitals affirmatively recognizing the Dorsey plat, which was *pro tanto* a substitute for the Reeder plat, as will be shown later. The dedication was therefore the dedication of the trustees of the Hughes estate. *Brown* v. *Manning,* 60 O. St., 298.

It is also claimed that the Reeder dedication was not in accordance with the laws then existing and consequently did not effect a "statutory dedication." For various reasons shown by the testimony here, I am inclined to believe that even if this be true, the facts show an accepted common law dedication which is under all the circumstances equally effective. But a careful consideration of the record will show a complete statutory dedication by Reeder's plat.

This manifestly was the view of Dorsey, who acquired through the Reeder assignment, and of Salmon P. Chase, who, in fact, made and recorded the Dorsey plat; and the views of so eminent a practitioner as Mr. Chase are not to be lightly regarded.

The statute in force when Reeder made and recorded his plat was the act of 1831 (Swan's Statutes [1845], pages 948-9), which provides for the platting of lands in towns and of additions thereto. Counsel in referring to this statute seem to misapprehend its terms and effect; for, while not happily worded, yet, upon careful reading, it seems to me to justify the view taken by Reeder, and by Mr. Chase, as is evidenced by their proceedings under it, in platting the lands in question as an "addition" to the town of Cincinnati (see Sections 7, 9 and 10 of the act, and also act of 1841 providing for vacations).

Reeder's plat, and his proceedings in reference to it, seem to have complied in all essential respects with the requirements of the statute and constituted a good statutory dedication.

The Dorsey plat, made by him as holder of title through McCleany and Bissell—to whom Reeder assigned—is for

the most part a recognition of Reeder's plat and is a complete affirmation of the Sycamore street dedication and Reeder's reservation of the two feet along the eastern boundary—the principal change being in the cross-streets leading eastwardly into Sycamore.

This plat is also executed with manifest care and reference to the statute, and is by endorsement thereon, accepted and ratified by Reeder under the terms of the reserved right of alteration endorsed on his own plat, and, so far as the changes made require, is adopted as a substitute.

But the changes thus made do not in any way affect or change Sycamore street; and the entire effect is therefore to recognize and affirm the dedication of said street.

It is objected that this land being at that time beyond the corporate limits, the city could not take the dedicated title. But this objection seems more specious than real. There is no question of the capacity of a municipality to hold property beyond its own limits for public purposes, as is now, and has been, the case beyond memory as to many public institutions; and it has long been the law that even in case of a common law dedication prior to the existence of a municipal corporation, when the corporation becomes organized and includes the land within its limits, the use of the land at once vests. *Cincinnati* v. *White*, 6 Pet., 431.

But it is not essential that the right of use should be vested in a corporate body. The public, it has been said, is an ever-existing grantee capable of taking dedications for public use, and its interests are a sufficient consideration to support them. (*Id.*).

The law of 1831 refers in terms to "additions" to a town, in such connections as clearly imply that such dedications are included in its provisions relating to subdivision, of land within its corporate borders. There would be no propriety in vesting the public use of the proposed extension of a city street, in the county commissioners, as counsel suggest, nor does the law so intend, as I construe it.

In view of the facts which to my mind clearly show a statutory dedication, it is perhaps unnecessary to go further

in this direction; and yet the proofs are such as to establish a common law dedication, if for any reason a statutory dedication is not maintainable.

It has been repeatedly held that the statutes prescribing rules for formal dedication do not abrogate the ancient common law rule in this regard. A common law dedication established by proof is just as effective to secure the rights of the public; but for the latter two things are to be proved, namely; a clear intention to dedicate, and an acceptance by the public.

Certainly, in the present case, the unbroken and re-affirmed intent of holders of the property from Hughes, in 1828, to Huntington, in 1875—a period of nearly fifty years—to dedicate Sycamore street is clearly shown by the record evidence.

As was said by the Supreme Court in *LeClerc* v. *Gallipolis, 7* O. (pt. 1), *220a:* "Anything which fully demonstrates the intention of the donor, or the acceptance by the public, works the effect"; and twenty years later (1855) the general term of this court, in *Gest* v. *Kenner (supra)*— affirmed by the Supreme Court in 7 O. St., 75—held that:

"No particular form of words is necessary to establish it, nor is lapse of time always essential; the acts of the owner of the land as well as of the public, though occurring in a comparatively brief period, are sufficient to prove a dedication."

So far as Reeder and his predecessors are concerned, it is clear that his assignment to McCleany and Bissell on the basis of his plat, and the subsequent affirmance by his assignees and the other purchasers in connection with the Dorsey plat, completed in a legal sense the common law dedication, and made the act irrevocable, not only as to Reeder and his assignees, but also to the successors in title to Hughes, whose agent Reeder was.

It is well settled that the acceptance by the public may be proved by parol; also, that it may be shown by any acts "appropriate to the conditions, such as would naturally flow from the character of the place and settlement of the community." *Winslow* v. *Cincinnati,* 6 N. P., 47

The testimony shows that until sometime after the acquisition of the lands by Huntington, the entire tract north of what is now Saunders street, lay in rear of the tier of large residence lots fronting eastwardly on Auburn street, which was the main thoroughfare from the city extending up "Sycamore hill" and through Mount Auburn to an intersection with the Vine Street hill road or "Carthage pike."

The lands thus situated were practically a rough hill lying at the head of an extensive ravine extending southwardly toward the city, but the character of the platting clearly shows that the early owners looked forward to a time when the territory would be required for the city uses; and, since Auburn street was a practical continuation in the line of Broadway northward, they projected similar extensions of Sycamore street, and of Main street northward, parallel with Auburn, and in practical conformity with the prevailing plan of city streets and squares. It is manifest upon a glance at the territory concerned that in accordance with the general practice established in the laying out of Cincinnati, and the subsequent experience with said plan, that the location of Sycamore street extension was dictated by a recognition of the future necessity for such thoroughfare, and it is not creditable to the foresight or sagacity of the owners of the lots to the eastward that they did not join in a like dedication of their half of said street as seems to have been anticipated by Reeder. To the situation, then, as it existed from 1838 down to about 1875, or later, the language of Circuit Judge Field (later of the Supreme Court) applies:

"No formal acceptance. is essential. * * * The dedication is irrevocable when third parties have been induced to act upon it and part with value in consideration of it. Nor is the irrevocable character of the dedication affected because the property is not at once subjected to the uses designed. In many instances, perhaps the greater number, there may be no present use of the land for the purposes designed, as in the case of streets and parks laid out upon a tract added to an existing city to meet its future growth. * * * In such cases it is understood that the property will

only be subjected to the uses intended as it may be from time to time needed, to meet the growth of the place. If immediate subjection were required in such cases the object of the dedication would be defeated." (Citing *Rowan's Ex.* v. *Portland,* 8 B. Mon., 232) ; *Grogan* v. *Hayward,* 4 Fed., 161.

To the same effect is the holding of the United States Circuit Court of Appeals in *Bank* v. *City of Oakland,* 90 Fed., 691.

The case of *The Town of Derby* v. *Alling et al.,* 40 Conn., 410, is also forcibly applicable to the facts of the present case.

"As the grantors," says the court, "could not have contemplated an immediate opening of all the streets, but the opening of them from time to time as they should be required by the growth of the village, an actual acceptance by the public of such streets or parts of streets as were not then opened, was not necessary.

"The grantors made an irrevocable dedication of the entire street as laid down on the map, and the acceptance by the public of the parts that were opened, was a constructive acceptance of the whole. Until the time when, under all the circumstances, the public authorities were called upon to extend Third street, no laches were chargeable to any one and the possession of the respondents did not begin to be adverse to the public right." And substantially to the same effect is *Fulton* v. *Mehrensfeld,* 8 Ohio State, 440.

It was not until 1875, or later, that the Huntingtons began to grade off the ground and actually open up the property to access and settlement. Mason street was extended through to Auburn avenue; Auburn place was extended to Lewis (Sycamore street), and the latter, for the space of nearly 100 feet, made use of to connect Auburn place with Estelle. It appears that in the construction, or at the permanent surfacing of Mason street by the city, curbs were turned in and Lewis street constructed a few feet up to the south line of Mason to indicate the debouche of Sycamore street or Lewis street upon Mason, and that

in constructing the 100 feet or thereabouts of Lewis street to connect Auburn place with Estelle, the curbs of Lewis street were turned south at Estelle to indicate the future extension of Lewis street south from Estelle to Saunders.

Just when these constructions were made does not appear; but testimony of the residents in the neighborhood places them at least as early as 1882 and probably the date is much earlier.

But the non-opening of Sycamore street as a whole with the other streets of the plat would seem, from all the circumstances, to be mainly due to the fact that what was dedicated was only half of the ultimate street, and, until the owners of lands east of it contributed their part, the time for its opening had not, and has not yet fully arrived. Nevertheless, lots had been sold in the subdivision, the strip had been treated as public property by non-taxation, and in minor ways the city authorities and adjoining owners, so far as occasion arose, recognized it as a street.

But the plaintiff claims that the reservation endorsed by W. C. Huntington on his plat of 1875 operated to revoke the dedication of Reeder. If the views hereinbefore indicated are correct, it is obvious that Huntington was without power to revoke.

In *Huber* v. *Gazlay,* 18 O. St., 18, where a similar question arose, it was held that where a common law dedication had become effective by sale of lots, no power remained in the grantor and his attempt to "reserve" in a subsequent plat was nugatory.

But the case here was even stronger. W. C. Huntington's title came from the leasehold granted to Reeder through the Saunders' heirs by deed in 1867, calling for lots "D, E, F. G, H and I, on the blue plat of the Dorsey subdivision by S. P. Chase, trustee, * * * subject to the covenants and conditions of a certain other lease made by the trustees of Thomas Hughes, deceased, to Eden B. Reeder," etc. In 1875 said Huntington acquired from the then trustees of Thomas Hughes a release and quit-claim to a tract bounded on the west by Locust street, north by Mason street, south by Saunders street—all being streets

designated by the name given upon his own plat (of 1875) and on the east by lands of Holden, Thoms, Smith and Huntington.

Then follows, as part of the description, these words: "Said lot being known as D, E, F, G, H and I, of the Dorsey blue plat, book ———, Hamilton County Auditor's office."

A release and quit-claim under the common law, was inoperative except the grantee held a prior estate in possession; but in Ohio it is regarded as a conveyance of title generally, *according to its terms.* (*Hall* v. *Ashby,* 9 O., 96).

In this case, however, the wording of the deed is careful and specific. There is no word of conveyance in it—such, for example, as "bargain," "sell," "grant," or "convey," which courts have sometimes seized upon to give it effect as an independent conveyance of title. The sole words here are "release" and "quit-claim"—which are not to all intents synonomous. Moreover, the grantors, notwithstanding the description of the land by boundaries, which must have been the suggestion of the grantee, are careful to follow it up by a declaration that it is in fact certain lots upon the Dorsey plat only that are conveyed, and they convey only their title and interest and covenant only against their own acts.

It conveyed, in a word, the residual title of the grantors to that, and that only, which was already held by the grantee under his perpetual leasehold. It did not and could not operate to enlarge his territorial holding. Huntington held, under his deed of 1867, specific lots of a subdivision bounded on and subject to public rights in certain portions set apart as public streets shown on a plat which was a public record. As the successor in title to the dedicators he was bound by their acts (*Gest* v. *Kenner,* and *Huber* v. *Gazlay,* *supra*).

The careful wording, no less than the form of the deed of the trustees, show that they were acting advisedly and in recognition of the fact that they had no title to and could not convey the right which their predecessors had already dedicated to the public.

It follows, therefore, that the reservation endorsed on the Huntington plat was nugatory, since he acquired no title to Sycamore street.

It appears that at the date of his plat (1875), he owned on both sides of Sycamore street from Estelle street southward to Mount; and perhaps intended the so-called reservation to be a notice merely of his intention to institute vacation proceedings under the statute; but, immediately after filing his plat, to-wit, in 1875, he sold lot 81 and in 1877 sold lot 82, these lots extending at the west side of Lewis street from Saunders to Auburn place, beyond Estelle; and later sold the property to the east of Lewis between Estelle and Saunders. The house now owned by the plaintiff was built, as shown, on lot 81, in about 1883, upon the line of Sycamore street with manifest reference to it as a public street; and Mr. Frank Huntington, who owned at both sides of Sycamore, testifies that he always understood that Sycamore street was a dedicated street, and knew nothing of any reservation. Other neighborhood owners testify to the same general understanding.

As already shown, the plat of 1875, filed by W. C. Huntington, shows Sycamore (Lewis) street in full lines as an open street from Mason to Saunders exactly as in the Dorsey and Reeder plats, showing also the two-feet reservation to the east.

Although this plat shows Sycamore street discontinued from Saunders street south, it is clear that Huntington did not rely upon his reservation, as is shown by the fact that he subsequently took proceedings under the statute to vacate Sycamore street from Saunders south. It is possible, as suggested in argument, that he intended to reserve only from Saunders south and that the reference to Estelle is a mistake. This seems probable, because the plat and reservation are wholly at variance, but for reasons given I think the reservation was wholly nugatory for any purpose.

There is more in the testimony that tends to strengthen the views hereinbefore expressed, but the reasons given seem to me conclusive in showing that the title to the strip in controversy is vested in the city and for the benefit of

the public for street purposes.    I find also that the quit-
claim deed of W. C. Huntington to the plaintiff, so far as
it purports to convey the twenty-three feet actually platted
as Lewis street, is void as to such portion, but that said
deed is good, as to the remaining two feet, to vest the title
in trust in the plaintiff, until such time as the owners may
dedicate as contemplated by the Reeder and Dorsey dedica-
tions.

Judgment for defendant, with costs, dismissing the peti-
tion.

*O'Hara & Jordan* and *C. P. Brown,* for plaintiff.
*C. J. Hunt,* City Solicitor, *contra.*